UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| **DONALD LEE ARMOUR,** | |
| **Plaintiff,** | |
| v. | No. 2:17 CV 50 |
| **ERIC TCHAPTCHET,** | |
| **Defendant.** | |

## OPINION and ORDER

Donald Lee Armour, a prisoner without a lawyer, filed a second motion for default judgment against Dr. Eric Tchaptchet. (DE # 37.) Federal Rule of Civil Procedure 55 governs the entry of default and default judgment. When a defendant fails to answer a complaint or otherwise defend himself, that party is in default. Fed. R. Civ. P. 55(a). Although Dr. Tchaptchet's answer was due on January 30, 2019 (*see* DE # 25), he has not appeared, responded to the complaint, or otherwise defended himself in this case to date. Thus, the Clerk entered default against him. (DE # 29.) Armour subsequently filed a motion for default judgment (DE # 30), but the court denied it with leave to refile because he had not sufficiently tied the allegations in the complaint to the requested damages. (DE # 34 at 5–7.) He was granted additional time to gather relevant evidence in order to refile his motion. (*Id*. at 7-8.)

The entry of default is only the first step in obtaining a default judgment. Applying to the court for a default judgment is the second step. Fed. R. Civ. P. 55(b)(2). In general, once a default is entered, "the well-pleaded allegations of the complaint

relating to liability are taken as true . . ..” *Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990) (citations omitted); *but see* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688.1 (4th ed. 2019) ("[A] party in default does not admit conclusions of law."); *Rosenbaum v. Seybold*, No. 1:06-CV-352-TLS, 2013 WL 633284, at *7 (N.D. Ind. Feb. 20, 2013) (conclusions of law not deemed admitted). However, "[e]ven when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004) (citation omitted); *see also Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994) (*citing United States v. DiMucci*, 879 F.2d 1488, 1497 (7th Cir. 1988)). A default judgment may not be entered without a hearing pertaining to damages unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) (*quoting Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)).[1]

---

[1] Of note, absent specific statutory provisions not relevant here, there is no absolute right to a jury trial on damages in cases where a default has been entered. *See Sells v. Berry*, 24 Fed. Appx. 568, 571–72 (7th Cir. 2001) ("In the case of a default, only 28 U.S.C. § 1874 may guarantee a right to a jury trial, and that statute applies only to actions to recover the forfeiture annexed to any articles of agreement, covenant, bond, or other specialty.") (internal quotation marks and citation omitted); *see also Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1124 (10th Cir. 2003) (same, collecting cases); *Graham v. Malone Freight Lines, Inc.*, 314 F.3d 7, 16 (1st Cir. 1999) ("Neither the Seventh Amendment nor the Federal Rules of Civil Procedure require a jury trial to assess damages after entry of default in these circumstances."); *Dierschke v. O'Cheskey*, 975 F.2d 181, 185 (5th Cir. 1992) ("[I]n a default case neither the plaintiff nor the defendant has a constitutional right to a jury trial on the issue of damages."); 10A Charles Alan Wright,

Armour, who was housed at the Porter County Jail during the time period in question, was granted leave to proceed against Dr. Tchaptchet for being deliberately indifferent to his undiagnosed neuropathy from July 18, 2016, through September 22, 2016, and for being deliberately indifferent to his two ischemic attacks on August 18–19, 2016, until his transfer on October 4, 2016, both in violation of the Fourteenth Amendment. (DE # 17.) With regard to his neuropathy, Armour alleges that he arrived at the Porter County Jail on July 8, 2016, with preexisting issues from a neck fracture/cervical fusion in 1994. He began complaining to Dr. Tchaptchet on July 18, 2016, about "numbness, tingling, pins and needles, and aching pain" from his right shoulder to his lower right extremities. (DE # 16 at 3.) He was given an x-ray, which according to the documents attached to the complaint, was "within normal limits cervical fusion remains stable." (*Id*. at 14.) Dr. Tchaptchet also prescribed Flexeril, a muscle relaxer, but Armour alleges that he remained in pain and continued to complain to medical staff. Armour states that he was "finally approved for an MRI" on September 22, 2016. (*Id*. at 7.) However, documents attached to the complaint show that the MRI was performed on September 8, 2016, and that he was seen by an outside physician, Dr. Anton A. Thompkins, on September 22, 2016, to discuss the results of the MRI which indicate:

> [N]o evidence of any significant neural compromise as per my reading in the cervical region. There is some mild foraminal narrowing, but I do not think that is the cause of symptoms today. Standing AP and lateral cervical xrays show no evidence of any dislocations. . . . I have told him I

---

Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 (4th ed. 2019) ("But neither side has a right to a jury trial on damages.").

3

> think the best mode of treatment would be, at this point, treat him from a medical standpoint. I would try him on some Neurontin 300 mg 3 times a day to see if that helps him, but I am comfortable in saying that surgery is not indicated at this stage.

(*Id.* at 24.) Armour was prescribed the Neurontin, which he indicates provided "some relief." (*Id.* at 7.) He was transferred out of the Porter County Jail to the Kankakee County Jail on October 4, 2016, which ended his interactions with Dr. Tchaptchet.

As to Armour's transient ischemic attacks (TIA),[2] he alleges that on August 18, 2016, his "blood pressure spiked to dangerous levels" due to pain from his previously untreated condition. (*Id.* at 4.) The nurse wanted to transport him to the emergency room, but, after conferring with Dr. Tchaptchet, he decided not to approve the transport. Instead, Armour was given Clonidine, a medication to lower his blood pressure, and he was subsequently placed in the medical isolation unit. The next day, he suffered another TIA. Again, although the medial staff wanted to transport him to another facility, Dr. Tchaptchet declined the transfer, prescribed more Clonidine, and told him to "try and get some rest." (*Id.* at 6.) Armour remained in medical isolation for a week, and he requested but did not receive CT scans and MRIs "to determine his condition as far as strokes or heart attacks." (*Id.*) Other than Clonidine, Armour did not receive treatment for the TIAs prior to his departure from the Porter County Jail on

---

[2] "A transient ischemic attack (TIA) is like a stroke, producing similar symptoms, but usually lasting only a few minutes and causing no permanent damage. Often called a ministroke, a transient ischemic attack may be a warning. About 1 in 3 people who have a transient ischemic attack will eventually have a stroke, with about half occurring within a year after the transient ischemic attack." https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited March 26, 2021).

October 4, 2016.³ Armour does not allege that he suffered any additional TIAs after his transfer, nor does he allege that he suffered a full, post-TIA stroke at any time.

The amended complaint requests $1,000,000 in compensatory damages and $9,000,000 in punitive damages from Dr. Tchaptchet. (DE # 16 at 10.) The motion for default judgment does not list any monetary figures related to the damages sought, even though he was previously directed to describe such damages in detail and state his reason for seeking each type. (*See* DE # 34 at 6-9.) More importantly, although the amended complaint's well-pleaded factual allegations set forth above are deemed true for purposes of default, Armour has still not sufficiently tied those allegations to the requested damages. "[T]o recover damages [in a default judgment proceeding] a plaintiff must prove that the Defendants caused the damages he sustained." *Tate v. Troutman*, 683 F. Supp. 2d 897, 907 (E.D. Wis. 2010), *aff'd sub nom Tate v. Riegert*, 380 Fed. Appx. 550 (7th Cir. 2010). Here, in his refiled motion for default judgment, Armour asserts that Dr. Tchaptchet "recklessly and unconcernness (sic) placed my central nervous system at a high risk of danger." (DE # 37 at 3.) Such a conclusory statement

---

³ In February of 2017, Armour received approval from the medical staff at the Kankakee County Jail for a CT scan. The findings were mostly normal with "the possibility of demyelinating plaque in the setting of multiple sclerosis," so an MRI was scheduled. (DE # 16 at 25.) The subsequent April 3, 2017, MRI results were also mostly normal with "[s]cattered, faintly discrete high signal regions, periventricular deep white matter, consistent with scattered ischemic changes along distribution of lenticular striated arteries. However, limited multiple sclerosis with plaquing in these regions a diagnostic possibility. No high signal lesions in the right and left periventricular area or involvement of cerebellar peduncles, corpus callosum, militate against multiple sclerosis. Clinical correlation required, including other test results for multiple sclerosis." (*Id*. at 27.) The physician interpreting the results also noted, "Scattered periventricular glottic foci with little or no involvement of the optic nerve, corpus callosum, cervical cord or cerebellar peduncles. These areas most consistent with ischemic changes and not multiple sclerosis." (*Id*.)

5

need not be taken as true. *See Tate*, 683 F. Supp. 2d at 907.

>Specifically, Armour claims that he is:

>forced to walk with a cane and sometimes a walker due to muscle wasting on his right side of his body, suffers muscle wasting, muscle twitching and extreme cramp outbreaks daily, loss of control over his bladder, having to wear disposable pull-up underwear, libido dysfunction/impotence, small vessel ischemic vascular disease brain (dementia) if white matter changes continue to progress over time, and depression, loss of healthy vision, and speech, and ongoing medical treatment with rehab, and home healthcare aid/assistance with medication, cooking, washing, and hygiene support. Plaintiff's future dreams has (sic) been suddenly shattered.

(DE # 37 at 3.) However, he has still not provided any medical evidence or physician opinions attributing those issues/problems to the actions of Dr. Tchaptchet. As the court noted previously:

>Armour's statement that Dr. Tchaptchet caused or permanently exacerbated his current impairments is undercut by several exhibits attached to his complaint and motion. For example, a week after his arrival at the Porter County Jail—and three days prior to when he alleges he began complaining to Dr. Tchaptchet—Armour submitted a request to medical stating he had "very little feeling in [his] right leg, arm, pain into neck right side. Need ex-ray. Former neck injury." (DE # 16 at 12; DE # 30-1 at 10.) He submitted another request the following day, noting that he was "a victim of a spinal injury." (*Id.* at 13; *id.* at 11.) These documents suggest that at least some of Armour's current impairments pre-existed his interactions with Dr. Tchaptchet.

(DE # 34 at 6–7.) Armour has provided updated medical information with his current motion. (*See generally* DE # 37-1 at 2–38.) However, as with his prior submissions, none of the documents indicate when the ischemic changes likely occurred, that the changes were because of Dr. Tchaptchet's treatment choices, or that the symptoms he is currently experiencing were the result of the undiagnosed neuropathy from July

through September of 2016 or the TIAs he experienced in August of 2016. (*Id*.)

On March 12, 2020, Dr. Thompkins did opine that the previous MRI showed "areas that are most consistent with ischemic changes, which could be considered an ischemic type stroke." (*Id*. at 2.) That said, he did not speculate as to the timing or cause of those changes, nor did he indicate that they are causing Armour's present impairments. During that same visit, Dr. Thompkins noted that Armour's range of motion was normal in all areas tested, that his strength was 5/5 in all muscle groups tested, that his gait and station were normal, and that he "ambulates unassisted," which contradicts several of Armour's claims described above. (*Id*. at 3.) Dr. Thompkins recommended further evaluation from a neurologist "who is more qualified in this area in terms of diagnosing brain issues as related to this." (*Id*.) Throughout April and May of 2020, Armour visited the Neurological Institute and Specialty Centers, where he had several MRIs and a nerve conduction study performed. (*Id*. at 5–38.) Again, none of these documents indicate that Armour's lengthy list of ailments is specifically attributable to his undiagnosed neuropathy or the TIAs he experienced in August of 2016. Of relevance, notes from an April 29, 2020, visit state he has "no impairment of memory," and a motor examination found strength of 5/5 in all areas tested, no changes in muscle tone, no atrophy, and normal muscle bulk. (*Id*. at 11.) It was observed that Armour did require the assistance of a cane, but he was able to stand without

7

difficulty.[4] (*Id*.) Subsequent MRIs showed the "possibility" of chronic ischemic changes but "no evidence of restricted diffusion to suggest an acute infarct." (*Id*. at 19.) The MRI from May 1, 2020, showed "no MR evidence or acute intracranial abnormality." (*Id*. at 20.) EMGs from May 4–6, 2020, revealed evidence of an "underling myotonic disorder," which is a genetically determined disease,[5] but "no electrodiagnostic evidence for an active lumbosacral (motor) radiculopathy, large fiber peripheral neuropathy, or any other disorder of the lower motor neuron except as noted." (*Id*. at 22, 25.) Additionally, notes from a visit to the Neurological Institute and Specialty Centers on May 14, 2020, indicate that Armour has a possible myotonic disorder. (*Id*. at 34, 36.) While it is clear Armour has a variety of long-term medical ailments, he has not sufficiently proven that the actions of Dr. Tchaptchet caused any of those symptoms or issues. *See Tate*, 683 F. Supp. 2d at 907. Therefore, his request for compensatory damages on this basis will be denied.

That said, Armour also alleges Dr. Tchaptchet disregarded his complaints of pain

---

[4] Notes regarding his self-reported past medical history indicate he has a gait disorder that is "not clear based on history of vascular (stroke 8/2016; right arm and leg dysfunction) related or due to remote effects from cervical spine fractures after Dr. Anigbo did surgery 1994 . . . MRI cervical 8/2019 . . . Dr. Thompson has recently seen and feels neurological." (DE # 37-1 at 9.) Although Dr. Thompson observed that there were ischemic changes seen on the MRI report, nowhere in the medical documentation provided does Dr. Thompson opine that Armour's gait disorder is neurological.

[5] "The myotonic disorders are a heterogeneous group of genetically determined diseases that are unified by the presence of myotonia, which is defined as failure of muscle relaxation after activation. The presentation of these disorders can range from asymptomatic electrical myotonia, as seen in some forms of myotonia congenita (MC), to severe disability with muscle weakness, cardiac conduction defects, and other systemic features as in myotonic dystrophy type I (DM1)." *See Myotonic Disorders: A Review Article*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4852070/ (last visited March 17, 2021).

and suffering related to his undiagnosed neuropathy from July 18, 2016, to September 22, 2016, and the pain he experienced as a result of the two TIAs on August 18–19, 2016, up until the time of his transfer on October 4, 2016. Because pain and suffering alone caused by a delay in providing treatment can constitute actionable damages, *see e.g. Arnett v. Webster*, 658 F.3d 742, 752–53 (7th Cir. 2011), Armour will be allowed to present testimony and/or other evidence regarding his pain and suffering—during that time period only—at a hearing. *See* Fed. R. Civ. P. 55(b)(2) (providing that the court may conduct hearings or make referrals to "determine the amount of damages" and "establish the truth of any allegation by evidence"); *see also Quirindongo Pacheco v. Rolon Morales*, 953 F.2d 15, 16 (1st Cir. 1992) (Before holding a hearing to "establish the truth of any averment" in the complaint, the court should make "its requirements known in advance" so that he can "understand the direction of the proceeding and marshall such evidence as might be available [to him].").

Finally, as to Armour's request for punitive damages, he asks the court to award him $9,000,000 in order to "afford adequate deterrence and set a precedential (sic) before prison medical staff violating prisoners'/inmates rights to proper medical care and treatment for serious illness and injuries, also promote respect for the law, and their Hypocratic (sic) oath." (DE # 37 at 4.) Punitive damages are only available when "evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others" has been shown. *Kyle v. Patterson*, 196 F.3d 695, 697–98 (7th Cir. 1999) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)); *see also Sahagian v. Dickey*, 827 F.2d 90, 100

(7th Cir. 1987) (punitive damages are appropriate when a plaintiff can demonstrate aggravating circumstances, malicious intent, or conduct involving reckless or callous indifference to his rights). However, "[p]unitive damages are never awarded as a matter of right; the finder of fact, after reviewing the entire record, is called upon to make a 'moral judgment' that the unlawful conduct warrants such an award to punish the wrongdoer and deter others." *Merriweather v. Family Dollar Stores of Indiana*, 103 F.3d 576, 582 (7th Cir. 1996). Normally, evaluations of such motive or intent are not suitable for summary judgment, but courts have recognized an exception "where a plaintiff fails to produce evidence raising a material question of fact regarding aggravating circumstances or the reckless or callous nature of the defendant's actions." *Kyle*, 196 F.3d at 698 (citing *Sahagian*, 827 F.2d at 100 n.8).

Here, Armour has not provided any evidence that would make a punitive damages award appropriate in this case. He attaches an affidavit that describes the actions of Dr. Tchaptchet on May 18–19, 2016. (DE # 37-1 at 1.) In it, he reiterates his allegation that the nursing staff wanted to transport him to the hospital after discovering that his blood pressure had spiked, but Dr. Tchaptchet refused to authorize the transport.[6] However, it is undisputed that Dr. Tchaptchet immediately prescribed

---

[6] Armour states that Dr. Tchaptchet "cancelled" the transport, but it is not reasonable to assume the transport was imminent without his prior approval. (DE # 37-1 at 1.) He admits the nurse indicated she "ha[d] to make a call first," which resulted in the authorization being denied. (*Id.*)

Clonidine[7] and that he was placed in the medical isolation unit for observation for a week. As to his neuropathy, Armour alleges he arrived at the Porter County Jail with preexisting issues from a neck fracture/cervical fusion in 1994 and began complaining to Dr. Tchaptchet shortly thereafter. He was given an x-ray, which was within normal limits, and was prescribed a muscle relaxer. When he continued to complain of pain, he was approved for an MRI, which he received within two months of arriving at the Jail. In accordance with the recommendations of the physician who read the MRI results, he was then prescribed Neurontin, which Armour indicates provided some relief. Based on these facts, this is not a case where he was recklessly or callously ignored or where any malintent or was shown on the part of Dr. Tchaptchet. While the allegations in the complaint may be sufficient to meet the less demanding standards necessary to state a Fourteenth Amendment claim,[8] Armour has not come close to showing the "evil motive or the level of deliberate indifference necessary to support an award of punitive

---

[7] Clonidine is a medication used to lower blood pressure. *See* https://medlineplus.gov/druginfo/meds/a682243.html (last visited March 17, 2021).

[8] A pretrial detainee states a valid Fourteenth Amendment claim by alleging that (1) the defendants "acted purposefully, knowingly, or perhaps even recklessly," and (2) the defendants' conduct was objectively unreasonable. *Miranda v. Cty. of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-74 (2015); *see also Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (extending *Kingsley's* objective inquiry to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees). However, "negligent conduct does not offend the Due Process Clause," so a showing of negligence or even gross negligence will not suffice. *Miranda*, 900 F.3d at 353.

damages." *Kyle*, 196 F.3d at 698. Therefore, his request for punitive damages will be denied.

For these reasons, the court:

(1) **DENIES** the motion for default judgment (DE # 37) to the extent Donald Lee Armour is seeking that judgment be entered in the amount of $10,000,000;

(2) **GRANTS** the motion to the extent that the matter will be referred for a hearing on potential damages solely regarding Donald Lee Armour's complaints of pain and suffering related to his undiagnosed neuropathy from July 18, 2016, to September 22, 2016, and the pain he experienced as a result of the two TIAs on August 18–19, 2016, up until the time of his transfer on October 4, 2016;

(3) **REFERS** this matter to Magistrate Judge Andrew P. Rodovich to conduct an evidentiary hearing and to prepare a report and recommendation on the issue of such specific potential damages.

<div align="center">**SO ORDERED.**</div>

Date: March 30, 2021

<div style="margin-left:50%">s/James T. Moody<br>
JUDGE JAMES T. MOODY<br>
UNITED STATES DISTRICT COURT</div>